RECEIPT #_____
AMOUNT $_____150_____
SUMMONS ISSUED __Yes__
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED_____
BY DPTY. CLK.__21_____
DATE_____11-18-03____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RAYTHEON COMPANY,                      )
                                       )
          Plaintiff,                   )
                                       )
v.                                     )          CIVIL ACTION NO.
                                       )          _____
NATIONAL UNION FIRE INSURANCE          )
COMPANY OF PITTSBURGH, PA.,            )
                                       )
          Defendant.                   )
                                       )

# 03 CV 12300 RCL

MAGISTRATE JUDGE Bowler

## COMPLAINT AND JURY DEMAND

Plaintiff Raytheon Company ("Raytheon") files this Complaint and Jury

Demand and alleges as follows:

## PARTIES

1.    Raytheon is a Delaware corporation with its principal place of business in

Lexington, Massachusetts.

2.    Defendant National Union Fire Insurance Company of Pittsburgh, Pa.

("National Union") is a Pennsylvania corporation with its principal place of business

in New York.

3.      This Court has original jurisdiction of this matter pursuant to

28 U.S.C. § 2201(a) in that the matters at issue present an actual, real, justiciable

controversy between Raytheon and National Union.

4.      This Court has original jurisdiction of this matter pursuant to

28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the

parties and the matters in controversy exceed the sum or value of $75,000, exclusive

of interest and costs.

5.      National Union is subject to the jurisdiction of this Court, and venue is proper

in this Court.

## FACTUAL BACKGROUND
## THE NATIONAL UNION INSURANCE PROGRAM

6.      Pursuant to a Stock Purchase Agreement entered into on April 14, 2000 and

closed effective July 7, 2000 (hereinafter "SPA"), Raytheon and Raytheon Engineers

& Constructors International, Inc. ("RECI"), as Sellers, sold various engineering and

construction direct and indirect subsidiaries of RECI, including Raytheon Engineers

& Constructors, Inc. ("RE&C"), to Morrison Knudsen Corporation, a Delaware

corporation, n/k/a Washington Group International Inc. ("WGII"), as Buyer. The

stock of the first tier subsidiaries owned directly by RECI was transferred by

agreement with WGII to an operating subsidiary of WGII known as Morrison

Knudsen Corporation, an Ohio corporation, n/k/a Washington Group International,

Inc., an Ohio corporation ("WGI"). Thereafter, certain companies sold to WGII were

merged into or became affiliates of WGI.

-2-

7.     Before the closing of the SPA, commencing on April 1, 1994, RE&C and the other former, indirect construction company subsidiaries of Raytheon and Raytheon, itself, were insured under a program of insurance issued by National Union, consisting, in part, of a primary policy providing commercial general liability ("CGL") coverage, among other coverages, in the amount of $5 million. Pertinent excerpts of this policy, No. 00 319 70 97, (hereinafter the "Primary Policy") are attached hereto as Exhibit "A."

8.     The National Union Primary Policy contained as Endorsement No. 1 a "Retained Amount Endorsement" providing, *inter alia*, that "in the event" National Union paid any damages under the Policy, the Named Insured would reimburse the full amount of such payment up to the $5 million per occurrence retained amount for CGL Claims.

9.     The Retained Amount Endorsement also required the Named Insured to reimburse National Union for any Allocated Loss Adjustment Expenses ("ALAE") incurred, which is defined in paragraph 10 of the endorsement to include defense costs, and costs of settling CGL Claims.

10.    According to the Declarations Page 1, the Primary Policy defined the "Named Insured" to include Raytheon and its "owned, controlled, affiliated or subsidiary companies...," including RE&C and the other construction subsidiaries later merged into or that became affiliates or subsidiaries of WGI. Coverage for the WGI

companies under the National Union program ended as of the closing of SPA on July 7, 2000.

11.    In addition to the Primary Policy, National Union also issued to Raytheon an umbrella liability policy, effective April 1, 1994, providing $20 million in coverage for Raytheon, RECI, RE&C, and the other former, indirect construction company subsidiaries of Raytheon, each of whom were defined as the "Named Insured." Pertinent excerpts of this policy, No. BE 308-99-35, (hereinafter the "Umbrella Policy") are attached hereto as Exhibit "B."

12.    Like the Primary Policy, the Umbrella Policy contained a $5 million "retained limit" with respect to CGL claims, as specified in item 2(A)(2) of the Declarations page and Endorsement 12.

13.    Because the $5 million coverage limits of the Primary Policy were fully offset by the $5 million retention in Endorsement 1 and given the $5 million "retained" limit in the Umbrella Policy, no insurance proceeds were payable under Raytheon's National Union insurance program until the amount of the claim penetrated the $20 million layer of coverage provided by the Umbrella Policy. CGL claims within the $5 million retention were treated as self-insured.

14.     In June 1999, Raytheon and National Union entered into a Payment

Agreement, effective June 1, 1998, concerning certain rights and obligations under

the National Union insurance program.  A true and correct copy of the Payment

Agreement is attached hereto as Exhibit "C."

15.     The Payment Agreement specifies at page 3 that it "is between *you*, the

organization(s) named as 'our Client' in the *Schedule*, and us, the insurer(s) named in

the *Schedule*."  At page 4, the Payment Agreement defines " 'you' as the person or

organization named as our Client in the title page of this Agreement ... and each of its

subsidiary, affiliated or associated organizations that are included as Named Insureds

under any of the *Policies*...."  On the title page, "our Client" is identified as

"Raytheon Company"; and at the time of execution of the Payment Agreement,

RE&C and the other companies that were later merged into or became affiliates or

subsidiaries of WGI were included within the definition of "You."

16.     In relevant part, paragraph 10 at page 4 of the Payment Agreement defines

*"Your* **Payment Obligation"** as the obligation of Raytheon and its direct and indirect

subsidiaries who were Named Insureds under the National Union program to "pay us

for the insurance and services in accordance with the terms of the *Program*... [and] to

indemnify us for any amount that we may pay on *your* behalf because of any

occurrence... with respect to which *you* are a self-insurer...."  According to

paragraph 9, each entity within the definition of *"You"* in the Payment Agreement,

including the predecessors of WGI, "is jointly and severally liable... for the entire

amount of *Your Payment Obligation.*"

17.    No language of the Payment Agreement includes former direct or indirect subsidiaries of Raytheon (the "Client") within the definition of "You" or extends "Your Payment Obligation" to impose joint and several liability on Raytheon for any post-divestiture obligations of its former indirect subsidiaries to National Union to pay any obligations assumed by WGI as self-insurer under the National Union program.

18.    Paragraph 7 at page 4 of the Payment Agreement confirms that the first $5 million layer of coverage under the Primary Policy is self-insured by defining the terminology **"Retained Amount"** or **"Retention,"** as used in the applicable endorsements of the National Union Primary Policy, to include:

- **Self-Insured Retention**:  the amount specified in the applicable *Policy* as *your* Self-Insured Retention per occurrence…

- **Deductible:**    the amount specified in the applicable *Policy* as the Reimbursable or Deductible portion of *Loss* we pay per occurrence….

## COURSE OF DEALING
## UNDER THE NATIONAL UNION PROGRAM

19.    From the inception of the National Union insurance program in 1994, up to the closing of the SPA on July 7, 2000, when all coverage for the sold subsidiaries of Raytheon ended, RE&C and its construction company affiliates that were sold to WGII remained covered as Named Insureds under the Primary Policy and Umbrella Policy, which were renewed annually.  During this period, RE&C and its affiliates:

-7-

(a)     Selected and retained defense counsel to defend lawsuits alleging CGL claims and paid the fees of defense counsel directly, with no oversight by National Union;

(b)     Paid directly all costs associated with litigating and investigating the CGL claims;

(c)     Investigated the allegations of the CGL claims and any defenses;

(d)     Managed the defense of the CGL claims or lawsuits;

(e)     Independently evaluated the risk or exposure to liability and damages for the CGL claims; and

(f)     Negotiated and paid all settlements of significant CGL claims.

20.     Pursuant to understandings between National Union, Raytheon and its indirect construction subsidiaries, when claims were settled within the scope of the National Union insurance program, National Union required Raytheon or RE&C to "pre-fund" the amount of any settlement that exceeded the sum of $100,000 by paying the settlement amount to National Union in advance of any payment by National Union to the claimants.

21.     The course of dealing in settling claims is illustrated by proceedings in *Phillips Puerto Rico Corp. Inc. v. Raytheon Catalytic, Inc.*, Case No. 2060 (Ct. Common Pleas, Philadelphia Cty.), in which National Union required the Named Insured, Raytheon Catalytic, Inc., to pre-fund the $5 million self-insured portion of a $19 million cash payment that National Union made to settle that lawsuit, as shown by the transcript of the settlement hearing, a copy of which is attached as Exhibit "D,"

-7-

and by a letter from AIG Risk Management dated April 26, 1999, a copy of which is

attached as Exhibit "E."

22.    In the April 14, 2000 SPA, WGII, as Buyer, agreed to assume full

responsibility for and to indemnify Raytheon and RECI for all matters listed as "tort"

claims on Annex C to the SPA, a copy of which is attached hereto as Exhibit "F," as

well as for several recently filed or threatened personal injury and property damage

claims also listed in the SPA (collectively "Underlying Lawsuits"). All potential

liability for those claims transferred to WGI or WGII as of the closing of the SPA on

July 7, 2000.

23.    Upon information and belief, and consistent with the previous course of

dealing by RE&C, its affiliates and National Union prior to July 7, 2000, after the

Closing of the SPA and up to the filing of its petition for reorganization in the

Bankruptcy Case (See infra, paragraphs 25 through 32), WGII and/or WGI and their

subsidiaries and affiliates continued to direct the defense, to pay defense counsel

directly, and otherwise to pay all related costs of defense (ALAE) incurred in the

Underlying Lawsuits.

24.    Upon information and belief, after the closing of the SPA on July 7, 2000,

WGII and/or WGI and their subsidiaries and affiliates continued to pay invoices

forwarded to WGI by National Union for the costs of settling small claims for less

than $100,000 in accordance with the "pre-funding" threshold established for such

claims.

ATLLIB01 1614516.1 11/12/03 5:27 PM

## WGI'S BANKRUPTCY AND THE BANKRUPTCY COURT'S
## PLAN CONFIRMATION ORDER

25.    On or about May 14, 2001, WGII, WGI and all of their affiliates insured under

the National Union program, filed a petition in the United States Bankruptcy Court

for the District of Nevada, In re Washington Group International Group, Inc. et al.,

Bankruptcy Case No. BK-N-01-31627-GWZ.  The filing of this petition automatically

stayed the further prosecution of all lawsuits pending against WGI as of that date,

including all of the Underlying Lawsuits.

26.    Despite the protection afforded by the automatic stay, from time to time, WGI

consented to the entry of orders lifting the automatic stay, allowing various claimants

to pursue ongoing litigation; but only to the extent any judgment eventually obtained

would be paid from the proceeds of an insurance policy.  One such matter was a third-

party action styled *Valero Refining Company-New Jersey v. RECI*, Docket No.

L-06598-99 (Sup.Ct. Camden City, N.J., Law Div.).  A true and correct copy of the

stay-lifting order allowing the *Valero* litigation to proceed is attached as Exhibit "G."

27.    Shortly after entry of the consent order regarding the *Valero* matter, WGII and

certain of its direct and indirect subsidiaries and affiliates, including WGI (hereinafter

"Debtors"), filed a motion in the Bankruptcy Court to "reject" the National Union

Primary Policy, but not the Umbrella Policy, alleging in part that the Primary Policy

provides "no benefit to [Debtors]."  The Bankruptcy Court granted this motion, ruling

that the Primary Policy would be deemed rejected "to the extent executory" and

otherwise recognizing that Debtors were in breach of their obligations under the

-9-

Primary Policy. A copy of the rejection order, entered October 31, 2001, is attached as Exhibit "H."

28.    Before and after entry of the rejection order, Debtors and their creditors, including Raytheon, entered into lengthy negotiations regarding Debtors' proposed Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Act. As part of the process, Debtors prepared and presented to the Bankruptcy Court an order approving the Plan of Reorganization, as Amended, which the Bankruptcy Court approved and signed on December 21, 2001 (hereinafter "Plan Confirmation Order"), a copy of which is attached as Exhibit "I."

29.    In paragraph D.6(f) of the Plan Confirmation Order, the Bankruptcy Court modified "the automatic stay and any applicable injunctions" to allow "Insurance Claims," defined as any claim alleged to be "covered by or payable ... from the proceeds of insurance" to be litigated. However, the Bankruptcy Court specifically limited the amount of any potential monetary recovery in such case "solely" to the proceeds of insurance, providing, with respect to claims within a self-insured retention or deductible, as follows:

> Any unpaid portion of any self-insured retention or deductible amount stated in any potentially applicable Insurance Policy ("Deductible") and the balance of any Insurance Claim not paid from proceeds of on Insurance Policy shall be deemed to be and treated as a General Unsecured Claim under Class 7 of the Plan. On the Effective Date, the unpaid portion of any Deductible shall be deemed to have been fully and actually satisfied, discharged and paid. (emphasis added).

ATLLIB01 1614516.1 11/12/03 5:27 PM

## WGI'S DISPUTE WITH NATIONAL UNION

30.     Following confirmation of WGI's Plan of Reorganization and entry of the Plan Confirmation Order, upon information and belief, several claimants resumed the prosecution of their previously stayed lawsuits, apparently alleging that the claims at issue were potentially payable from the proceeds of the National Union insurance program.

31.     Upon information and belief, WGI and National disagreed with respect to which entity had the obligation to defend and pay the costs of the underlying lawsuits, leading to the filing of a lawsuit in the Superior Court of Suffolk County, Massachusetts, styled as *Washington Group International, Inc. v. National Union Fire Insurance Company of Pittsburgh, P.A.*, Civil Action No. 02-4581 (hereinafter "WGI Lawsuit"). National Union removed the WGI Lawsuit to the United States District Court for the District of Massachusetts, as Civil Action No. 02-12184-RCL; and pursuant to an order entered April 16, 2003, WGI filed its First Amended Complaint in the WGI Lawsuit, a true and correct copy of which is attached as Exhibit "J."

32.     In paragraph 22 of its Amended Complaint in the WGI Lawsuit, WGI alleged, *inter alia*, that "National Union has admitted it has a duty to defend the Underlying Lawsuits," adding, however, that National Union has refused to do so absent "assurances that Raytheon would reimburse National Union for all defense fees and costs incurred...."

-11-

33.     Ignoring the prior course of dealing and the plain language of the retained

amount endorsement of the National Union insurance program, WGI alleged,

*inter alia*, that National Union had breached its contractual obligations by

conditioning its "defense of the Underlying Lawsuits on a repayment from Raytheon"

and by forcing WGI to pay defense fees, costs and other damages "in connection with

the Underlying Lawsuits...." *See* Exhibit "J" at ¶¶ 42 – 46.

34.     As alleged in ¶ 42 of the Amended Complaint in the WGI Lawsuit, and *in lieu*

of seeking reimbursement as a Class VII creditor in accordance with WGI's Plan of

Reorganization, National Union contends that it is entitled to recover 100% of all

costs, fees and damages, including settlement expenses, incurred in resolving the

Underlying Lawsuits from Raytheon in accordance with the terms of the Payment

Agreement attached hereto as Exhibit "C." Accordingly, to protect its interests and

rights under the National Union insurance program, Raytheon filed a motion to

intervene in the WGI Lawsuit on April 7, 2003.

35.     Upon information and belief, during June, 2003, WGI and National Union,

without any participation or knowledge of Raytheon, entered into discussions to settle

the WGI Lawsuit. At about the same time, the Honorable Reginald C. Lindsey

denied Raytheon's motion to intervene; and after the filing of Raytheon's appeal of

right from this ruling, WGI and National Union filed a stipulation dismissing the WGI

Lawsuit in its entirety, including a dismissal with prejudice of certain of WGI's

claims and a dismissal without prejudice of other claims, including WGI's alleged

right to recover from National Union the full amount of all defense costs incurred in

-12-

connection with the Underlying Lawsuits. Thereafter, Raytheon, WGI and National

Union agreed to dismiss, without prejudice, Raytheon's appeal in the WGI Lawsuit,

reserving all rights of the parties with respect to the claims and allegations at issue,

including those claims alleged herein. A true and correct copy of the Stipulation of

Dismissal filed in the United States Court of Appeals for the First Circuit is attached

hereto as Exhibit "K."

36.    Upon information and belief, pursuant to the stipulation dismissing the WGI

Lawsuit and the underlying settlement between WGI and National Union, National

Union assumed the obligation to defend the Underlying Lawsuits, reserving its

alleged rights to recover from Raytheon the full amount of all attorneys' fees, costs

and other expenses incurred in resolving those cases, reserving also its alleged rights

to recover from Raytheon the costs of any payment made previously or made in the

future with respect to any defense costs and other expenses incurred by WGI in

connection with the Underlying Lawsuits.

37.    Upon information and belief, following execution of the Settlement

Agreement with WGI, National Union has continued, acting unilaterally and

voluntarily, to defend and resolve the claims asserted in the Underlying Lawsuits

without invoking appropriate defenses, including, but not limited to the fact that all

claims against WGI and its affiliates have been discharged in bankruptcy and that any

claim within the scope of a self-insured retention or "deductible" of any possibly

applicable policy, such as the National Union policies, must be deemed an "unsecured

ATLLIB01 1614516.1 11/12/03 5:27 PM

claim" in bankruptcy in accordance with paragraph D.6(f) of the Plan Confirmation Order attached hereto as Exhibit "I."

38.    National Union has acted unilaterally and voluntarily, without Raytheon's knowledge or consent and over Raytheon's express objection, to settle one or more of the Underlying Lawsuits for amounts less than the $5 million retention in the primary policy, all while claiming, erroneously, and without legal justification, that Raytheon ultimately is responsible for payment of such claims.

39.    Despite the bankruptcy of WGI and the language of Paragraph D.6(f) of the Plan Confirmation Order discharging claims within the $5 million retention of the National Union program, National Union forwarded a billing to Raytheon, in the amount of $607,317.64, for "RE&C paid losses" allegedly incurred by or on behalf of WGI during the period from September, 2000 through June, 2003 involving claims against the former, indirect construction subsidiaries that merged into or became affiliates of WGI.  A copy of the September 8, 2003, cover letter forwarding the billing together with a spreadsheet of billings most relevant to this lawsuit are attached as Exhibit "L."

40.    By letter dated October 17, 2003, Raytheon responded to National Union's billing by pointing out that the charges on the billing spreadsheet appeared to relate to claims against WGI and its affiliates and subsidiaries which have been discharged by the bankruptcy court's rulings and by denying any responsibility to pay National Union for any such claims or any other obligation National Union voluntarily

-14-

incurred by virtue of the unilateral settlement agreement with WGI and without Raytheon's consent. In this letter, a copy of which is attached as Exhibit "M," Raytheon also reserved it rights to pursue appropriate remedies if National Union attempted to collect any portion of the billed amount by drawing upon Raytheon's letter of credit.

41.     On or about November 3, 2003, without responding to Raytheon's letter attached as Exhibit "M" and otherwise without further notice to Raytheon, National Union presented a site draft to Citizens Bank of Massachusetts drawing $1,562,661.22 from Raytheon's letter of credit. This draw was wrongful, in violation of law and in breach of the applicable agreements between Raytheon and National Union regarding issuance and maintenance of the letter of credit.

42.     On or about October 31, 2003, National Union mailed to Raytheon a "Demand for Arbitration" invoking the arbitration clause of the Payment Agreement that is attached hereto as Exhibit "C" and demanding a monetary award totaling the sum of $1,562,661.22, which is the exact amount National Union has already recovered by wrongfully drawing down Raytheon's letter of credit placed with the Citizens Bank of Massachusetts, as alleged above. A copy of the Demand for Arbitration, exclusion of its attachments, is attached as Exhibit "N." Paragraphs 1 and 2 of National Union's demand seek a double recovery of monetary sums to which it is not entitled under the law or applicable contracts and sums that National Union already has received by wrongfully drawing upon the Raytheon letter of credit.

ATLLIB01 1614516.1 11/12/03 5:27 PM

43.     An actual, real, and justiciable controversy exists between National Union and

Raytheon with regard to the obligations of the parties under the National Union

insurance program in light of the proceedings in the Bankruptcy Case and in

particular paragraph D.6(f) of the Plan Confirmation Order.  This Court's declaration

with respect to this controversy is necessary to declare the rights and legal relations of

the parties with respect to the National Union insurance program and is necessary to

avoid piecemeal litigation of such issues in multiple forums that might lead to

inconsistent rulings regarding the meaning of insurance policies issued in

Massachusetts, covering Named Insureds headquartered in Massachusetts, and

governed by Massachusetts law.

## CLAIM FOR DECLARATORY JUDGMENT

### COUNT I
### COSTS OF LIQUIDATING UNSECURED CLAIMS

44.     Raytheon incorporates the allegations and averments in paragraphs 1 – 43

above as if expressly set forth herein.

45.     Paragraph D.6(f) of the Plan Confirmation Order allows claimants to pursue

"Insurance Claims" only to the extent the eventual judgment entered is payable

"solely from the proceeds of such Insurance Policy;" however, no such proceeds are

payable under the Primary Policy because the $5 million coverage amount is fully

offset by the $5 million retention, which is equivalent to a self-insured retention or

"deductible," as that term is used in paragraph D.6(f) of the Plan Confirmation Order.

-16-

ATLLIB01 1614516.1 11/12/03 5:27 PM

Accordingly, any judgment for less than $5 million constitutes an unsecured, Class 7 claim that must be pursued in the Bankruptcy Case.

46.    National Union is obligated under its Umbrella Policy to pay any damages awarded in excess of $5 million and to defend such claims up to the Umbrella Policy's aggregate limits of $20 million; however, paragraph D.6(f) of the Plan Confirmation Order discharges any obligation of National Union under the Primary Policy to pay any judgment or to defend claims that do not exceed the $5 million retained amount.

47.    To the extent WGI has incurred defense costs pursuant to its obligations under the Plan of Reorganization to the Plan Committee and in accordance with the provisions of paragraph D.6(f) of the Plan Confirmation Order authorizing the "Plan Committee ... to take any and all actions necessary or appropriate to litigate, object, settle or otherwise resolve such Insurance Claim," then WGI cannot shift such costs to National Union or to Raytheon.

48.    Pursuant to 28 U.S.C. §§ 2201, 2202, Raytheon is entitled to a judgment declaring:

    (a)    By virtue of the Retained Amount Endorsement and the course of dealing between the parties, the National Union Primary Policy does not provide "first dollar" coverage or require National Union to pay claims for damages within the $5 million retention;

-17-

(b)    The National Union Primary Policy is a self-insured retention or "deductible" program within the meaning of paragraph D.6(f) of the Plan Confirmation Order;

(c)    Pursuant to paragraph D.6(f) of the Plan Confirmation Order, WGI has the obligation to defend and pay the cost of liquidating, as an unsecured Class 7 Claim, any lawsuit listed on Exhibit B to WGI's Amended Complaint in the WGI Lawsuit seeking damages within the $5 million retention.

**COUNT II**
**DECLARATORY JUDGMENT REGARDING NATIONAL UNION'S INSURANCE OBLIGATIONS**

49.    Raytheon incorporates the allegations and averments in paragraphs 1 – 43 above as if expressly set forth herein.

50.    The National Union Umbrella Policy contains a $5 million retained limit which is a self-insured retention or "deductible," as that term is used in paragraph D.6(f) of the Plan Confirmation Order, Exhibit "I," hereto.  Thus, National Union is obligated under its Umbrella Policy to pay any damages awarded in excess of the $5 million limit and to defend such claims up to the Umbrella Policy's aggregate limits of $20 million.

51.    Coverage Part II of the National Union Umbrella Policy, Exhibit "B" hereto, provides in relevant part that after the underlying limits of the Primary Policy are exhausted by payment, National Union is obligated to "defend any suit against the

-18-

Insured alleging liability insured under the provisions of this [Umbrella Policy] and

seeking recovery for damages on account thereof...."

52.    By virtue of the provisions of paragraph D.6(f) of the Plan Confirmation Order

providing that the self-insured retention (deductible) amount of any insurance policy

shall be deemed "satisfied, discharged and paid" and because the amount of the $5

million self-insured retention in the Primary Policy offsets the $5 million limits, those

limits are deemed exhausted and paid by the terms of the Bankruptcy Court's order,

thereby triggering National Union's obligation under Coverage II of the Umbrella

Policy to defend and indemnify such claims.

53.    Pursuant to U.S.C. §§ 2201, 2202, Raytheon is entitled to a judgment

declaring:

    (a)    By virtue of paragraph D.6(f) of the Plan Confirmation Order,

        National Union has the duty under its Umbrella Policy to defend

        and reimburse any costs incurred by the insureds with respect to

        any of the Underlying Lawsuits, up to the point at which such

        claim is determined to be an unsecured claim in the Bankruptcy

        Case;

    (b)    Pursuant to paragraph D.6(f) of the Plan Confirmation Order,

        National Union shall be obligated under its Umbrella Policy to pay

        the amount of any judgment or claim with respect to the

        Underlying Lawsuits, to the extent that the amount of such

-19-

judgment exceeds the applicable self-insurance retention or

deductible and is not deemed to be an unsecured claim in the

Bankruptcy Case.

## COUNT III
### DECLARATORY JUDGMENT REGARDING RAYTHEON'S ALLEGED INDEMNITY OBLIGATION

54.    Raytheon incorporates the allegations and averments in paragraphs 1 – 43

above as if expressly set forth herein.

55.    Upon execution of the Payment Agreement, Raytheon agreed to maintain a

clean, unconditional, irrevocable, and evergreen letter of credit (hereinafter "Letter of

Credit") in the amount of $34,406,162.00 to secure any payment obligations that

Raytheon, as the "Client" named in the Payment Agreement, might incur.  On or

about July 25, 2000, Raytheon and National Union agreed to reduce the letter of

credit amount to $25,804,621, with the balance of the security being provided by a

"Cash Flow Bond" in the amount of $8,601,541.

56.    Paragraph 9 at page 4 of the Payment Agreement originally defined "*you*" to

include Raytheon (the "Client" named on the title page) and also "its predecessor and

successor organizations...." (underlining added)

57.    Paragraph 5 at page 4 of the Payment Agreement originally defined

"Predecessors," when referring to insurance, to mean "insurance policies or other

contracts that we have with *you* that became effective prior to the effective date of

this Agreement, under which you have unpaid payment obligations to us of the kind

ATLLIB01 1614516.1 11/12/03 5:27 PM