described under *Your Payment Obligation*, whether or not such obligations are yet due and payable."

58.     In relevant part, Paragraph 10 at page 4 of the Payment Agreement originally defined "*Your* Payment Obligation" to include the obligation of Raytheon and its direct and indirect subsidiaries to pay for the "insurance and services" provided and to indemnify National Union for any self-insured losses paid in accordance with the terms of the *Program*. *Your Payment Obligation* includes, but is not limited to, any of the following that apply according to this Agreement, the *Policies*, their <u>*Predecessors*</u>, terms described in the *Schedule*, and other agreements...." (underlining added).

59.     In order to clarify their intent that the Payment Agreement did not apply retroactively to claims relating to obligations that had accrued under the National Union insurance program before June 1, 1998, the effective date of the Payment Agreement, National Union and Raytheon executed Addendum #1 to the Payment Agreement. This Addendum deleted both the definition of "Predecessors" in Paragraph 5 at page 4 of the Payment Agreement and the reference in the definition of "*you*" to "predecessor" organizations, as well as "all references ... to the term 'predecessors', throughout the Agreement."

60.     The deletion of any reference in the Payment Agreement to "predecessor" insurance policies and to the term "predecessors" in general established that Raytheon's "payment obligation" (a) did not encompass any insurance claim that had

-21-

accrued based on an occurrence before the effective date of the Payment Agreement on June 1, 1998; and (b) that Raytheon had no further obligation with respect to future payments in connection with the defense or settlement of claims against "predecessor" organizations, including the former, indirect subsidiaries of Raytheon sold to WGII on July 7, 2000.

61.     Upon information and belief, in recognition of its prior course of dealing regarding RE&C and the other former, indirect construction and engineering subsidiaries of Raytheon, after the closing of the SPA on July 7, 2000, National Union billed and obtained payment from WGII and/or WGI and their subsidiaries and affiliates for ALAE expenses National Union incurred of less than $100,000 in connection with claims covered by the Primary Policy, while WGI continued to direct the defense, pay defense counsel and pre-fund any settlement of CGL claims for amounts in excess of $100,000.

62.     By its conduct, National Union agreed that it would look solely to WGII and/or WGI and their subsidiaries and affiliates to satisfy any reimbursement obligations under the Primary Policy and that National Union would not seek to obtain any reimbursement from Raytheon with respect to liabilities transferred to and assumed by WGI after the closing of the SPA on July 7, 2000.

63.     Consistent with past course of dealing and the addendum deleting all references to "predecessors" from the Payment Agreement, National Union accepted the substitution of WGII and/or WGI and their subsidiaries and affiliates for Raytheon

with respect to the defense and payment of CGL claims within the $5 million retained amount of the Primary Policy, thereby discharging Raytheon from any further obligations under the Payment Agreement and the Letter of Credit with respect to such claims.

64.     Despite the past course of dealing between the parties, National Union has invoked in the past and continues, after the date of the SPA, to invoke the Payment Agreement as a basis for demanding reimbursement from Raytheon of any payments National Union has made or may make in the future to WGI or on WGI's behalf with regard to claims against the former RECI subsidiaries within the $5 million retention of the Primary Policy, including the Underlying Lawsuits.

65.     Despite the past course of dealing between the parties, National Union has invoked the Payment Agreement as a basis for wrongfully drawing down Raytheon's Letter of Credit to obtain reimbursement of payment made by National Union with respect to the Underlying Lawsuits.

66.     The Court's declaration with respect to this controversy is necessary to declare the rights and legal relations of Raytheon and National Union with respect to the Payment Agreement and Letter of Credit, thereby avoiding piecemeal litigation of such issues in multiple forums that might lead to inconsistent rulings.

67.     Consistent with the past course of dealing and with the terms of the Payment Agreement, as modified by Addendum #1, Raytheon is entitled to a judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that:

(a) The Payment Agreement does not apply to payments made for ALAE or other losses in connection with claims against the former RECI subsidiaries sold to WGII based on occurrences covered or alleged to be covered under National Union policies in effect before the effective date of the Payment Agreement, June 1, 1998;

(b) The Payment Agreement does not obligate Raytheon to take any action, make any payment, or reimburse National Union with regard to ALAE or other losses incurred after July 7, 2000 in connection with claims against the former RECI subsidiaries sold to WGII;

(c) Any letter of credit issued pursuant to or specified in the Payment Agreement, and specifically the Letter of Credit No. LC-011598 issued by Citizens Bank of Massachusetts, dated July 25, 2000, does not provide any security for payments National Union has made or may make for ALAE or other losses incurred after July 7, 2000 in connection with claims against the former RECI subsidiaries sold to WGII; and

(d) National Union has no right to and is specifically prohibited from presenting any draft against, drawing and collecting upon, or otherwise impairing any letter of credit issued pursuant to the Payment Agreement, including specifically the Letter of Credit No. LC-011598 issued by Citizens Bank of Massachusetts, dated July 25, 2000, to obtain reimbursement of payments National Union may make for

ALAE or other losses incurred after July 7, 2000 in connection with claims against the former RECI subsidiaries sold to WGII.

## COUNT IV
## CLAIM FOR UNJUST ENRICHMENT/RESTITUTION

68. Raytheon incorporates the allegations and averments in paragraphs 1 – 43 and 55 – 65 above as if expressly set forth herein.

69. After the acquisition by WGII of the former, indirect construction and engineering subsidiaries of Raytheon and the merger and/or affiliation of certain of those subsidiaries with WGI, and pursuant to the course of dealing alleged herein, National Union submitted various invoices for ALAE and other claims payments made for or on behalf of WGI within the $100,000 threshold of the Primary Policy self-insured retention directly to WGII and/or WGI and their subsidiaries and affiliates; and upon information and belief, WGI paid those invoices up until shortly before the filing of its petition in bankruptcy on or about May 14, 2001.

70. As a result of its bankruptcy, WGII and/or WGI and their subsidiaries and affiliates failed and/or refused to pay certain invoices forwarded by National Union for ALAE payments, totaling an amount in excess of $400,000, which included the sum of $300,000 for an annuity purchased in accordance with an agreement to settle a CGL claim asserted by Mykel Brister for $750,000, the $400,000 cash portion of which had been paid directly by WGI to the claimant in accordance with the past course of dealing between the parties. The Brister claim accrued before June 1, 1998, the effective date of the Payment Agreement.

71. During the course of the WGI bankruptcy proceedings, recognizing that the bankruptcy law prevented it from collecting any payment directly from WGI, National Union forwarded the WGI invoices to Raytheon, demanding that Raytheon immediately pay those invoices and claiming improperly that the Payment Agreement obligated Raytheon to do so.

72. By letter dated August 7, 2001, a copy of which is attached hereto as <u>Exhibit "O"</u> Raytheon denied that it had any obligation to indemnify National Union or otherwise to reimburse National Union for ALAE or claims payments it made on behalf of WGI within the self-insured layer of the Primary Policy.

73. In a letter dated October 8, 2001, a copy of which is attached hereto as <u>Exhibit "P,"</u> National Union invoked the ambiguous definition of "you" in the Payment Agreement as a basis for claiming indemnity. Ignoring the course of dealing summarized above, and ignoring the provisions of Addendum #1 deleting "predecessors" in referring to former subsidiaries and claims under policies covering the period before June 1, 1998, including, but not limited to the Brister claim, National Union issued a letter dated November 1, 2001, a copy of which is attached as <u>Exhibit "Q,"</u> wrongfully threatening "to draw on your security" (the Raytheon Letter of Credit) if Raytheon did not immediately reimburse National Union for the full amount of CGL claims payments it had made on WGI's behalf.

74. In the face of National Union's wrongful threats to draw upon the Raytheon Letter of Credit, to avoid disrupting the process of reorganization during the WGI

Bankruptcy Case, and to avoid further controversy that could impede ongoing negotiations regarding the Bankruptcy Settlement Agreement and the approval of WGI's Plan of Reorganization, Raytheon paid, under protest, billings from National Union on WGI claims totaling the sum of $553,807.59, as shown by letters from Raytheon to National Union, dated October 1, 2001 and November 1, 2001, copies of which are attached as <u>Exhibits "R"</u> and <u>"S,"</u> respectively, while reserving all of its rights and continuing to deny any "responsibility for payment of any losses incurred by the former RE&C subsidiaries...."

75. National Union has unjustifiably and without legal right received and retained the payments made under protest by Raytheon; therefore, this Court should order repayment and restitution to Raytheon in the sum of $553,807.59, together with pre-judgment interest, which amounts National Union should not be allowed to retain in equity and in good conscience.

## COUNT V
## WRONGFUL DRAW ON CITIZENS BANK LETTER OF CREDIT

76. Raytheon incorporates the allegations and averments in paragraphs 1 – 43 and 55 – 65, as if expressly set forth herein.

77. National Union's draw on the Letter of Credit in the amount of $1,562,661.22 was wrongful and contrary to the terms of the National Union insurance policies, the Payment Agreement, the course of dealing between the parties, and applicable law, as the monies recovered by National Union were not owed by Raytheon.

78. Raytheon has been damaged by National Union's wrongful draw on the Letter of Credit; therefore, this Court should order repayment and restitution to Raytheon of $1,562,661.22, the sum wrongfully drawn from the letter of credit, together with prejudgment interest.

## COUNT VI
## VIOLATION OF MASS. GEN. LAWS CH. 93A

79. Raytheon incorporates the allegations and averments in paragraphs 1 – 43 and 55 – 64 and 69 – 75, as if expressly set forth herein.

80. The behavior of National Union at all times relevant to the facts set forth in this Complaint is unethical, oppressive, inherently unfair and constitutes unfair or deceptive acts or practices in the business of insurance within the meaning of M.G.L. c. 176D § 3 and unfair or deceptive acts or practices within the meaning of M.G.L. c. 93A § 2.

81. National Union has performed and is performing unfair and deceptive acts or practices by having used in the past and by intending to use in the future the existence of the Raytheon Letter of Credit as a tactic to force payment from Raytheon of funds that Raytheon does not owe to National Union and by wrongfully drawing upon the letter of credit to obtain payment of funds that National Union is not lawfully entitled to recover from Raytheon.

82. National Union has performed and is continuing to perform unfair and deceptive acts or practices by drawing down on the Raytheon Letter of Credit and by threatening to do so in the future.

83. National Union has performed and is performing unfair and deceptive acts or practices by unjustifiably and unreasonably contending that the Payment Agreement applies retroactively to claims relating to insurance obligations before the effective date of the Payment Agreement on June 1, 1998, even though the plain language of the Payment Agreement clearly states that it does not apply retroactively.

84. National Union has performed and is performing unfair and deceptive acts or practices by refusing to allow Raytheon to participate in any way in the defense and settlement of the Underlying Lawsuits, despite the fact that Raytheon has demanded the right to participate in the defense and settlement of the Underlying Lawsuits and even though National Union has demanded in the past and presumably will continue to demand in the future reimbursement of all costs incurred by National Union in defending and settling the Underlying Lawsuits.

85. National Union has performed and is performing unfair and deceptive acts or practices by refusing to enlighten and inform Raytheon with respect to National Union's defense and settlement of the Underlying Lawsuits, despite the fact that Raytheon has requested information regarding the defense and settlement of the Underlying Lawsuits and even though National Union has demanded in the past and

presumably will continue to demand in the future reimbursement from Raytheon of all costs incurred in settling and defending the Underlying Lawsuits.

86.  National Union has performed and is performing unfair and deceptive acts or practices by failing to seek or failing to obtain authorization from Raytheon approving National Union's unilateral defense and settlement of the Underlying Lawsuits, even though National Union maintains that it has the right to seek reimbursement from Raytheon with respect to National Union's costs incurred in settling the Underlying Lawsuits.

87.  National Union's unfair and deceptive acts or practices have caused and in the future will cause Raytheon to lose money or property.

88.  National Union's unfair and deceptive acts or practices are willful or knowing, entitling Raytheon to up to three times the amount of Raytheon's actual damages, as proved at trial.

89.  National Union's unfair and deceptive acts or practices entitle Raytheon to its reasonable attorneys' fees and costs incurred in this action.

90.  National Union's unfair and deceptive acts or practices occurred primarily and substantially within the Commonwealth of Massachusetts.

ATLLIB01 1614516.1 11/12/03 5:27 PM

## COUNT VII
## PRELIMINARY INJUNCTION
## REGARDING NATIONAL UNION'S DEMAND FOR ARBITRATION

91.     Raytheon incorporates the allegations and averments in paragraphs 1 – 90 as if expressly set forth herein.

92.     National Union's Demand for Arbitration seeks to bring into the arbitral arena disagreements and causes of action that are not within the scope of the Payment Agreement's arbitration provision.

93.     National Union seeks to arbitrate insurance coverage issues although neither the Primary Policy nor the Umbrella Policy contain arbitration clauses. The Payment Agreement does not authorize the arbitration of insurance coverage issues.

94.     National Union relies on the Payment Agreement as authority for the right to demand arbitration with respect to payment for claims that arose before June 1, 1998, the effective date of the Payment Agreement, even though the Payment Agreement includes no terms making it retroactive. Indeed, the parties expressly addressed the issue of retroactivity when negotiating the Payment Agreement and decided that the Payment Agreement would not be retroactive.

95.     In its Demand for Arbitration, National Union seeks an award of funds it has already drawn on the Letter of Credit. Thus, any arbitration threatens to subject Raytheon to double payment to the same party for the same alleged debt.

96.  In its Demand for Arbitration, National Union seeks a declaration that Raytheon must indemnify National Union for legal fees incurred by National Union in defending a lawsuit brought by its insured, WGI, for bad faith and unfair and deceptive acts within the meaning of M.G.L. c. 176D § 3 and M.G.L. c. 93A § 2. No agreement between National Union and Raytheon, including the Payment Agreement, obligates Raytheon to so indemnify National Union, so there exists no valid agreement to arbitrate such a dispute.

97.  Under the terms of the arbitration provision in the Payment Agreement, pursuant to which National Union demands arbitration, the arbitral panel is precluded from awarding exemplary or punitive damages or any "multiple" damages; therefore, the relief Raytheon seeks in this Complaint, including the recovery of multiple damages for National Union's unfair and deceptive acts, cannot be awarded in arbitration.

98.  Raytheon has a strong likelihood of succeeding on the merits in showing that no current dispute between National Union and Raytheon is the subject of any agreement to arbitrate.

99.  Raytheon will suffer irreparable harm if the arbitration demanded by National Union is allowed to proceed, because the ban on exemplary and punitive damages denies Raytheon meaningful relief for the claims asserted in this Complaint.

100.  National Union will suffer no material damage if the arbitration is stayed pending the course of the instant litigation.

101.  The public interest will be furthered if the arbitration is not allowed to proceed, because the New York insurance professionals who will comprise the arbitral panel are barred from granting Raytheon, a Massachusetts insured, the meaningful relief due Raytheon under Massachusetts law.

102.  This Court has good cause to issue a preliminary injunction restraining National Union from pursuing arbitration of any of the claims set forth in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, having asserted its claims against WGI and National Union, Raytheon prays:

(a)  that this case be tried before a jury;

(b)  that judgment be entered in Raytheon's favor on Count I against National Union for the declarations sought in that count regarding applicability of paragraph D.6(f) of the Plan Confirmation Order to National Union insurance program;

(c)  that judgment be entered in Raytheon's favor on Count I against National Union for the declarations sought in that count regarding National Union's obligations under the Umbrella Policy;

(d)  that judgment be entered in Raytheon's favor on Count II against National Union for the declarations sought in that count regarding the Payment Agreement;

(e) that judgment be entered in Raytheon's favor on Count III against National Union for money damages in the principal amount of $553,807.59, together with prejudgment interest;

(f) that judgment be entered in Raytheon's favor on Count IV against National Union for money damages in the principal amount of $1,502,661.22, and additional costs of $3,936.65, together with prejudgment interest;

(g) that judgment be entered in Raytheon's favor on Count V against National Union for the relief sought therein, including an amount of up to three times the amount of Raytheon's actual damages, together with reasonable attorneys' fees and costs;

(h) that this Court issue a preliminary injunction restraining National Union from pursuing an arbitration demand seeking a double recovery and otherwise pursuing any demand for arbitration matters that are beyond the scope of the arbitration agreement pending beyond the resolution of the claims alleged in this lawsuit.

(i) that Raytheon recover its costs of this action, including reasonable attorneys' fees, from WGI and National Union, as appropriate; and

(j) that Raytheon have such other and further relief as the Court deems just and proper.

Respectfully submitted,

RAYTHEON COMPANY

By: /s/ William T. Hogan III

William T. Hogan, III (BBO No. 237710)
Elizabeth D. Killeen (BBO No. 645178)
Hogan, Roache & Malone
66 Long Wharf
Boston, MA 02110
(617) 367-0330


Of Counsel:

Edmund M. Kneisel, Esq. (Ga. Bar No. 425350)
Brent W. Brougher, Esq.(Ga Bar No. _____)
Kilpatrick Stockton LLP
1100 Peachtree Street
Suite 2800
Atlanta, GA 30309

Attorneys for Plaintiff, Raytheon Company

November 18, 2003