UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
RAYTHEON COMPANY,                   )
                                    )
            Plaintiff,              )
                                    )   CIVIL ACTION NO.
v.                                  )   1:03-CV-12300-RCL
                                    )
NATIONAL UNION FIRE INSURANCE       )
COMPANY OF PITTSBURGH, PA.,         )
                                    )
            Defendant.              )
                                    )
```

FILED
IN CLERK'S OFFICE

2003 DEC -8  A 11: 38

U.S. DISTRICT COURT
DISTRICT OF MASS.

## MEMORANDUM OF LAW IN SUPPORT OF RAYTHEON'S MOTION FOR PRELIMINARY INJUNCTION

### I. INTRODUCTION

Plaintiff Raytheon Company ("Raytheon") has filed this action to recover money damages and other relief, including treble damages allowable under Massachusetts law, based upon the wrongful, tortious acts of Defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") committed in Massachusetts. National Union precipitated this action in late October when, one working day after serving a Demand for Arbitration on Raytheon, National Union presented a sight draft to the Citizens Bank of Massachusetts drawing more than $1,500,000 from a letter of credit that Raytheon has maintained in National Union's favor for almost ten years. The Demand for Arbitration, a copy of which is attached as Exhibit "A," seeks recovery of the same monetary amount that National Union already obtained by drawing on the letter of credit, therefore, the Demand for Arbitration is largely moot.

National Union unlawfully drew upon Raytheon's letter of credit to obtain reimbursement of expenses National Union voluntarily incurred, without Raytheon's consent,

ATLLIB01 1626180.1

often without Raytheon's knowledge, and sometimes over Raytheon's express objection, to resolve claims brought against Raytheon's former, indirect construction subsidiaries that have been discharged by the bankruptcy of those companies. After unilaterally waiving all defenses to coverage for such claims, National Union seeks to shift liability for its voluntary payments to Raytheon. In addition, by demanding arbitration of what National Union mischaracterizes as a "payment dispute," National Union attempts to avoid adjudication of questions of insurance coverage under policies brokered and issued in Massachusetts to a company (Raytheon) headquartered in Massachusetts that are governed by Massachusetts law.

None of the National Union policies at issue in this case contains any arbitration clause, and the parties have never agreed to arbitrate insurance coverage disputes in New York or anywhere else. Indeed, there can be no dispute, as previously conceded by National Union in pleadings filed in this Court, that there is no basis arbitrating the claims Raytheon has alleged in Count II of its complaint regarding the Umbrella policies.[1] As alleged in Raytheon's complaint, those policies obligate National Union to defend the underlying claims and to pay any claims that reach the limits of those polices, which are not subject to any provisions of the Payment Agrement that National Union has invoked in demanding arbitration.

Raytheon is entitled to have its rights and obligations as the principal named insured under its policies adjudicated in this Court. Until the underlying issues of coverage are resolved, there is nothing to arbitrate because there can be no "dispute" over an alleged payment obligation that does not in fact exist. By demanding arbitration of a non-existent, payment dispute, National Union attempts to circumvent the Massachusetts law by depriving Raytheon of the

---

[1] See note 1 at page 3 of National Union's Brief in Partial Opposition to Raytheon Company's Motion to Intervene, filed in this Court in Civil Action No. 02-1284 RCL, excerpts of which are attached as Exhibit "B".

remedies available under Mass. Gen. L. c. 176D and c. 93A for the unfair and deceptive insurance settlement practices at issue in this case.[2]

## II.  STATEMENT OF FACTS

### A. The Raytheon Insurance Program

Beginning on April 1, 1994 and continuing up to June 1, 2002, National Union issued a series of primary and umbrella insurance policies covering Raytheon and all of its subsidiary companies for various losses and liabilities. The coverages included, but were not limited to, commercial general liability ("CGL") coverage for bodily injury and property damage claims of up to $20 million, after exhaustion of a $5 million "retained amount." *See* Affidavit of Matthew P. Lupa, attached hereto as Exhibit "C" ("Lupa Aff.") at ¶ 6. Because the $5 million "retention" equaled the limits of the primary coverage layer, the National Union insurance provided no coverage for CGL claims until the amount of a claim exceeded $5 million, thereby triggering the $20 million umbrella policy.

During the more than eight year period between the inception of the National Union program on April 1, 1994 and the subsequent bankruptcy of Washington Group International, Inc. ("WGI"), successor to Raytheon Engineers & Constructors, Inc. ("RE&C"), Raytheon and its direct and indirect subsidiaries, including RE&C:

  (a)  Selected and retained defense counsel to defend lawsuits alleging CGL claims and paid the fees of defense counsel directly, with no oversight by National Union;

  (b)  Paid directly all costs associated with litigating and investigating CGL claims;

  (c)  Investigated the allegations of the CGL claims and any defenses;

---

[2] It is undisputed that the relief Raytheon seeks in this lawsuit, treble damages for National Union's acts, as allowed under Mass. Gen. L. c. 93A, is not available under the arbitration clause, which specifically deprives the arbitrators of "the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise." *See* Exhibit "A", Payment Agreement at 11.

(d)  Managed the defense of the CGL claims or lawsuits;

(e)  Independently evaluated the risk of exposure to liability and damages for the CGL claims; and

(f)  Negotiated and paid all settlements of significant CGL claims.

Lupa Aff. ¶ 11.

### B. The Stock Sale and Subsequent Bankruptcy of WGI

Pursuant to a Stock Purchase Agreement entered into on April 14, 2000 and closed effective July 7, 2000 (hereinafter "SPA"), Raytheon and Raytheon Engineers & Constructors International, Inc. ("RECI"), as Sellers, sold RE&C and its construction company affiliates to Morrison Knudsen Corporation, a Delaware corporation, n/k/a Washington Group International Inc. ("WGII"). The stock of some of the sold companies was transferred by agreement to WGII's operating subsidiary, now known as Washington Group International, Inc., an Ohio corporation ("WGI"). Thereafter, certain other companies sold to WGII were merged into or became affiliates of WGI. All coverage under the National Union policies for the companies that merged into or became affiliates of WGI ("WGI Companies") ended when they ceased being indirect subsidiaries of Raytheon on July 7, 2000 and hence were no longer "named insureds" under the policies. However, those companies remained eligible for continuing coverage under the policies for claims based on accidents that had occurred during the period from April 1, 1994 through July 7, 2000.[3]

On May 14, 2001, WGII, WGI and the WGI Companies filed for bankruptcy protection in the United States Bankruptcy Court for the District of Nevada. The bankruptcy filing automatically stayed all lawsuits against the WGI Companies, including CGL claims that had

---

[3] After July 7, 2000, the WGI Companies continued to manage all significant claims internally and to pay defense costs, attorneys' fees and claims settlements directly. National Union forwarded billings to WGI and the WGI Companies reimbursed National Union for the costs of adjusting small claims within a $100,000 threshold previously established for such matters. *See* Lupa Aff. ¶ 11.

-4-

accrued during the National Union coverage period (April 1, 1994 - July 7, 2000). WGI emerged from bankruptcy protection in early 2002, following entry by the bankruptcy court of an order, dated December 21, 2001, approving WGI's Plan of Reorganization. Consistent with case authorities dealing with the impact of bankruptcy on insurance policies, the bankruptcy court modified the "automatic stay and any applicable injunctions" to allow claimants to pursue and enforce claims against the "proceeds of insurance." See Paragraph D.6(f) of the Plan Confirmation Order, a copy of which is attached hereto as Exhibit "D." Addressing the question of who should be responsible for payment of any self-insured retention or deductible portion of an insurance policy, the bankruptcy court's order provides as follows:

> Any unpaid portion of any self-insured retention or deductible amount stated in any potentially applicable Insurance Policy ("Deductible") and the balance of any Insurance Claim not paid from proceeds of an Insurance Policy shall be deemed to be and treated as a General Unsecured Claim under Class 7 of the Plan.

The $5 million amount specified in the "retained amount" endorsement of the National Union insurance program is a "self-insured retention" or "deductible" within the meaning of the Plan Confirmation Order. This amount has commonly been referred to as a "self-insured retention", a/k/a "SIR" and actually is defined as such in paragraph 7 at page 4 of the Payment Agreement that National Union invokes as the basis for its Demand for Arbitration. Indeed, in a brief National Union filed in the Superior Court of Camden County, New Jersey in *Blackiston, et al. v. Valero Refining Co.-New Jersey,* Docket Nos. L-06598-99 and CAM-L-3393-01, National Union repeatedly characterized the Raytheon insurance program as "self-insurance", noting that "RE&C was 100% 'self-insured'" for the losses at issue in that case.[4] In its brief, National Union also acknowledged that under the Payment Agreement, it is "patently obvious that National Union, *ab initio*, never had an obligation to spend or front payment that might be owed

---

[4] See pp. 2-7 of a brief filed in the *Valero* litigation on or about January 22, 2002, a copy of which is attached as Exhibit "E".

by RE&C to any third party, including Valero," noting also that "[a]s a result, National Union ... is not required to seek or appropriate funds from any RE&C account or Letter of Credit." Exhibit "E" at p. 6. Thus, Paragraph D.6(f) of the bankruptcy court's order, which clearly is entitled to full faith and credit in this or any other court, requires any damages of less than $5 million awarded on a CGL claim brought against the WGI Companies under the National Union policies to be recovered as an unsecured, Class 7 claim in bankruptcy.[5]

Despite its characterization of the insurance program as self-insured in the *Valero* case, National Union has consistently ignored Paragraph D.6(f) of the Plan Confirmation Order, refusing even to invoke that order to limit the recovery on CGL claims pending against WGI. Rather, National Union contends that despite Raytheon's sale of the WGI companies on July 7, 2000, Raytheon remained responsible for paying all of the claims costs, including attorneys' fees, settlement costs and the amount of any judgments entered against WGI within the $5 million self-insured layer. Instead of raising viable defenses to coverage and liability[6], National Union seeks to place all monetary responsibility for the WGI claims on Raytheon.

## C. The Payment Agreement

National Union's position that Raytheon is responsible for the costs of defending and settling all WGI claims, but that Raytheon cannot participate in the defense or make any decisions about the reasonableness of the settlement of those claims is blatantly inconsistent with Massachusetts law. National Union supports its conduct by invoking the language of a Payment

---

[5] The bankruptcy court's order is fully consistent with case authorities dealing with the impact of a bankruptcy on the obligations of the bankrupt insured and its carrier with respect to an SIR. *See, e.g., In re Keck, Mahin & Cate,* 241 B.R. 583 (Bankr. N.D. Ill. 1999). *See also In re Catania,* 94 B.R. 250 (Bankr. D. Mass. 1989).

[6] For instance, more than $950,000 of the amount drawn from Raytheon's letter of credit is attributable to costs incurred by National Union in voluntarily and unilaterally settling the *Valero* case, without Raytheon's consent, over Raytheon's express objection, and without regard to viable defenses to coverage that National Union refused to invoke. *See* March 6, 2002 letter from counsel for Raytheon to Ms. Dayva Zaccaria and others acting in behalf of National Union, a copy of which is attached as Exhibit "F".

-6-

Agreement that was first executed in June, 1999, more than five years after the Raytheon/National Union insurance program commenced. *See* Exhibit "1" to the Affidavit of Erik Eckilson ("Eckilson Aff."), filed herewith as Exhibit "G."[7]

The Payment Agreement does not apply retroactively to claims that accrued before its effective date, June 1, 1998. Thus, Addendum #1, paragraph 1, deletes paragraph #5, entitled **"Which Words Have Special Meanings in This Agreement,"** entirely, as well as "all references . . . to the term 'predecessors,' throughout the Agreement." The deleted paragraph reads as follows:

> **"Predecessors"** means insurance policies ... that we have with *you* that became effective prior to the effective date of this Agreement, under which *you* have unpaid payment obligations to us of the kind described under *your Payment Obligation*, whether or not such obligations are yet due and payable.

(Eckilson Aff., Ex. 1; and "redline," Ex. "H," p. 4, ¶ 5). Deletion of this paragraph and any other reference to "predecessors" establishes beyond dispute that the Payment Agreement and its arbitration clause cannot be applied retroactively to any claims that accrued under policies in effect before June 1, 1998.[8] (Lupa Aff., ¶¶ 4, Ex. 1, and 8; Eckilson Aff. ¶¶ 5-8).

### D. National Union's Post-Bankruptcy Actions and the Demand for Arbitration

Following confirmation of WGI's Plan of Reorganization by the bankruptcy court, WGI and National Union disputed their respective obligations to defend and pay the costs of lawsuits filed against WGI and its affiliates, leading to the filing by WGI of litigation against National Union, later removed to this Court as Civil Action No. 02-12184-RCL. Significantly, National Union did not contend that its dispute with WGI regarding the insurance program should be

---

[7] For the convenience of the Court, a "redline" version of the Payment Agreement, showing the changes negotiated by the parties that were incorporated in Addendum #1, is attached hereto as Exhibit "H."

[8] This is confirmed by paragraph 5 of Endorsement 65 of the Primary Policy, which specifies that the amount of "security" required for policy years 4/1/94 – 6/1/1998 as $20,665,662; and paragraph 2 at page 4 of the June 1, 2000 – June 1, 2001 schedule to the Payment Agreement, which specifies $13,740,500 as the "Security required for the 6/1/98 to 6/1/01 period." (Eckilson Aff. ¶ 8 and Exs. "4 and 5").

-7-

arbitrated or that WGI should remain jointly and severally liable under the Payment Agreement to satisfy Raytheon's obligations.[9]  By its actions in dealing with WGI, National Union concedes that WGI's obligations to National Union and National Union's obligations to WGI are governed exclusively by the insurance policies and not by the terms of the Payment Agreement.

WGI and National Union settled their disputes, in part, by National Union's agreeing to assume the defense of approximately 72 lawsuits pending against the WGI companies seeking damages based on alleged CGL claims that accrued between April 1, 1994, the effective date of the National Union insurance program, and July 7, 2000, the date on which Raytheon sold its former, indirect subsidiaries to WGII. Raytheon was not consulted and did not participate in the negotiations and agreements between WGI and National Union settling or partially settling their insurance disputes. Before and after the settlement, National Union, acting unilaterally, without Raytheon's consent, and sometimes over Raytheon's express objection, incurred expenses needlessly, settled uninsured claims, and otherwise acted voluntarily to make payments and to incur expenses in defending and adjusting WGI claims that should have been resolved as unsecured claims in the WGI bankruptcy, under the terms of the Plan Confirmation Order quoted above. Lupa Aff. ¶¶ 12-24.

National Union erroneously contends, more than three years after the stock sale and long after WGI and the WGI Companies ceased being "Named Insureds" under the National Union

---

[9] When the agreement was executed in June 1999, RE&C and the other Raytheon affiliates later sold to WGII also were subject to the Payment Agreement, which defines the terminology "You" to include Raytheon "and each of its subsidiary, affiliated or associated organizations that *are* included as Named Insureds under any of the Policies...." Exhibit "H" at p. 5 (emphasis added). This paragraph provides that each Named Insured "is jointly and severally liable...." for all obligations under the Agreement. However, no provision in the Payment Agreement makes Raytheon liable for the obligations of its former subsidiaries after they ceased being "Named Insureds"; and no provision of the Payment Agreement purports to make the former subsidiaries jointly and severally liable for Raytheon's obligations under the Agreement.

policies, that Raytheon still has responsibility for paying claims brought by creditors of WGI for damages within the amount of the $5 million SIR. National Union's motives are transparent, driven entirely by its commercial self-interest and its complete disregard of the interests and rights of its policyholder, Raytheon, under Massachusetts law. National Union is unfairly and deceptively attempting to shift liability to Raytheon for defense and other costs that are National Union's responsibility under the umbrella policy and that National has voluntarily incurred in complete disregard of its insured's rights under Massachusetts law.

After receiving a billing from National Union for its "RE&C" costs, Raytheon forwarded a letter to National Union, dated October 17, 2003, specifically denying any obligation to reimburse National Union for any expenses it incurred in connection with the WGI claims. Lupa Aff. ¶¶ 20 – 21, Ex. "14". Instead of responding to Raytheon's letter, National Union forwarded a "Demand for Arbitration" to Raytheon, dated October 31, 2003, invoking the "disputes" clause of the Payment Agreement. *See* Exhibit "A" hereto. This clause provides, in relevant part, that in the event of a dispute regarding any "amount that we have asked you [Raytheon] to pay," Raytheon will provide "written particulars" of the items that are the subject of dispute. Raytheon's October 17, 2003 letter to National Union satisfies this requirement. The agreement also provides in relevant part as follows:

> We will review the disputed items and provide *you* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement... about their correct amounts. Disputed items not resolved <u>within 60 days after our response</u> to your written particulars will be in default. Ex. "H," p. 11 (italics in original, underlining added).

National Union ignored this condition precedent to its Demand for Arbitration. The next working day, November 3, 2003, National Union presented a sight draft to Citizens Bank of Massachusetts, drawing $1,562,661.22 from a letter of credit Raytheon maintained to secure its

-9-

own obligations as a Named Insured under the National Union policies. *See* Lupa Aff. ¶¶ 22 – 23 and Ex. 15.

National Union filed its arbitration demand, without waiting the necessary 60 days, in an obvious attempt to circumvent and otherwise bar Raytheon's rights to recover damages under Massachusetts law for National Union's improper actions. Nation Union already has recovered 100% of the money sought in its Demand For Arbitration by wrongfully drawing on Raytheon's letter of credit. The only claim in the Demand for Arbitration that is not moot is National Union's request for a declaration validating National Union's unilateral actions and seeking a prospective determination that National Union may obtain future reimbursements from Raytheon for any claims expenses and costs that National Union incurs pursuant to its settlement agreement with WGI. The Demand for Arbitration seeks a declaration regarding disputes that are not covered by the terms of the Payment Agreement; disputes about insurance coverage under policies that do not contain any arbitration clause; disputes about claims that accrued before the effective date of the Payment Agreement; and disputes about claims for which liability has been discharged by Para. D.6 (f) of the Plan Confirmation Order quoted above. Because these issues should be decided in this Court in connection with Raytheon's claims under Massachusetts law, Raytheon respectfully submits that it is entitled to a preliminary injunctive prohibiting National Union from pursuing its Demand for Arbitration.

### III.  ARGUMENT AND CITATION OF AUTHORITY

#### A.  An Injunction Is Appropriate to Prohibit Arbitration of Claims Raytheon Did not Agree to Arbitrate.

The Court may order a preliminary injunction if the plaintiff can demonstrate that (1) it has a substantial likelihood of prevailing on the merits, (2) it faces a significant potential of suffering irreparable harm in the absence of immediate relief, (3) issuing an injunction will

burden the defendant less than denying an injunction would burden the plaintiff, and (4) issuing an injunction will promote or, at least not impair, the public interest. *McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001).

The First Circuit has sanctioned injunctions prohibiting a party from pursuing arbitration, noting that "[t]o allow a federal court to enjoin an arbitration proceeding which is not called for by the contract interferes with neither the letter nor spirit of [the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*]. Rather, to enjoin a party from arbitrating where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is present." *Societe Generale de Surveillance, S.A. v. Raytheon European Management and Systems Co.*, 643 F.2d 863, 868 (1st Cir. 1981).

"[P]roarbitration policy does not operate without regard to the wishes of the contracting parties." *HIM Portland LLC v. DeVito Builders, Inc.*, 317 F.3d 41, 43 (1st Cir. 2003) (citing *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 57 (1995)). "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986). What issues must be arbitrated "is a matter to be determined by the Court on the basis of the contract entered into by the parties." *Id.* at 649. The scope of an arbitration agreement "is undeniably a judicial determination," so that "a party will not be coerced to arbitrate an issue unless he has so agreed...." *PaineWebber, Inc. v. Elahi*, 87 F.3d 589, 594-95 (1st Cir. 1996) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)).

"A reluctant party has a right to a judicial determination of his obligation to arbitrate...." and is irreparably harmed if that right is not recognized. *PaineWebber, Inc. v. Hartmann*, 921 F.2d 507, 514-15 (3rd Cir. 1990) (quoting *AT&T Technologies*, 475 U.S. at 649). *See also Maryland Cas. Co. v. Realty Advisory Board on Labor Relations*, 107 F.3d 979, 985 (2nd Cir.

-11-

1997) (finding that time and resources that would be expended in a futile arbitration would not be compensable and therefore would constitute irreparable harm); *McLaughlin Gormley King Co. v. Terminix Int'l Co., L.P.,* 105 F.3d 1192, 1194 (8th Cir. 1997) (holding that an injunction was appropriate where the threatened irreparable injury was the cost of defending a futile arbitration and having the court later set aside any unfavorable award).

"[T]he basic objective in this area is not to resolve disputes in the quickest manner possible, no matter what the parties' wishes ..., but to ensure that commercial arbitration agreements, like other contracts, are enforced according to their terms." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 947 (1995). As recognized by these and many other authorities, the presumption in favor of arbitration is not a "mindless mantra," especially where, as here, National Union seeks to arbitrate claims that are plainly outside the scope of the Payment Agreement, and otherwise to bar Raytheon from seeking meaningful relief under Massachusetts law. *Rudolph v. Alamo Rent A Car, Inc.,* 952 F. Supp. 311, 317 (E.D. Va. 1997); *see also First Allmerica Financial Life Insur. Co. v. Minnesota Life Insur. Co.,* 188 F. Supp. 2d 101, 104 (D. Mass. 2002) (examining plain language of arbitration clause to determine that it applied to a narrow scope of disputes).

**B.     National Union Cannot Arbitrate Questions of Insurance Coverage for Claims Against the Bankrupt, Former, Indirect Subsidiaries of Raytheon Under Insurance Policies That Do Not Contain Any Arbitration Clause.**

Raytheon and National Union only agreed to arbitrate legitimate disagreements about payments <u>after</u> the parties exchanged information about the disagreement, <u>and after</u> the 60 days waiting period to demand arbitration expires. Moreover, the Payment Agreement arbitration clause presumes that a payment is legitimately due and that Raytheon has defaulted in making such a payment. Raytheon cannot be deemed to be in "default" for failing to make payments to National Union on uninsured claims that are not within the scope of coverage provided by the

-12-

ATLLIB01 1626180.1

National Union policies. In other words, an arbitrable dispute over payment cannot arise until there is coverage under an applicable policy for the claim that generated the payment. This antecedent issue should be resolved as a condition precedent to any arbitration of a payment dispute.[10] *See HIM Portland v. De Vito Builders*, 317 F.3d 41, 44 (1st Cir. 2003)("Where contracting parties condition an arbitration agreement upon the satisfaction of some condition precedent, the failure to satisfy the specified condition will preclude the parties from compelling arbitration and staying proceedings under the FAA."). Raytheon cannot be deemed to be in "default" within the meaning of the Payment Agreement for amounts never invoiced to Raytheon or for amounts National Union already has recovered by wrongfully drawing on Raytheon's letter of credit.

This lawsuit raises claims regarding the proper interpretation and application of the National Union insurance policies to claims against the bankrupt, former indirect subsidiaries of Raytheon. If National Union and Raytheon had agreed to arbitrate insurance coverage claims, an arbitration clause would have been incorporated in the insurance policies or an endorsement thereto. No such clause exists, and nothing in the Payment Agreement suggests that the parties agreed to arbitrate insurance coverage disputes.[11] Because the outcome-determinative issue of liability for insurance coverage is not arbitrable, it makes no sense to arbitrate Raytheon's

---

[10] Without conceding that the Payment Agreement and applicable conflicts of law principles would require application of New York substantive law rather than Massachusetts substantive law, New York law is consistent with Massachusetts law in holding that, "[a] condition precedent is an 'act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'" *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (N.Y. 1995). *See also, Steven Strong Development Corp. v. Washington Medical Assoc.*, 2003 WL 1090018 (N.Y. App. 3d Dept. 2003). "Express conditions must be literally performed." *Oppenheimer*, 86 N.Y.2d at 690.

[11] "Determining whether a particular dispute falls within the scope of an arbitration clause is a matter of both state contract law and federal arbitration law." *First Allmerica*, 188 F. Supp. 2d at 104. The Payment Agreement states that "[t]his Agreement will be governed by the laws of the State of New York." (Exhibit "H", p. 14). Under applicable New York law, "[w]ords in a contract are to be construed to achieve the apparent purpose of the parties." *Hooper Assoc., LTD v. AGS Computers, Inc.*, 548 N.E.2d 903, 905 (N.Y. 1989). *See also, McCarthy v. Azure*, 22 F.3d 351 (1st Cir. 1994) (limiting scope of arbitration clause based on state-law contract construction principles).

ATLLIB01 1626180.1

alleged obligation under the Payment Agreement to provide indemnity for such coverage before the threshold coverage issue is determined by this Court. *See Lippus v. Dahlgren Mfg. Co.*, 644 F. Supp. 1473, 1483 (E.D.N.Y. 1986) (denying motion to stay pending arbitration because "[a] trial on the merits of plaintiffs' claim may result in a finding of no derivative liability on the single claim to be arbitrated, thus rendering the arbitration moot").

In *Bowlby v. Carter Mfg. Corp*, 138 F. Supp. 2d 182 (D. Mass. 2001), the buyer of a business invoked an arbitration clause in the Stock Purchase Agreement to compel arbitration of claims filed in federal court by the seller for breach of an employment contract that had been executed pursuant to the Stock Purchase Agreement. Because the employment contract did not contain an arbitration clause, the court held that the employment dispute was not arbitrable. *Id.* at 188. Nevertheless, the court granted the buyer's motion to stay litigation of the employment dispute because the arbitrable issue of fraud in the inducement of the underlying Stock Purchase Agreement, which contained an arbitration clause, would determine the outcome of the employment claim. *Id.* at 188-89. The court ruled that "the potential for preclusive effect in this federal proceeding of a decision by the arbitrator in the Antecedent Arbitration counsels against splitting issues ... among two forums." *Id.* at 188.

Raytheon's claims in this Court present the mirror image of the situation in *Bowlby*. In this case, the outcome-determinative, "antecedent" coverage issues that trigger the allegedly arbitrable payment "dispute" under the Payment Agreement arise under insurance policies that <u>do</u> <u>not</u> <u>contain</u> an arbitration clause. It is undisputed that the obligation to pay the first $5 million of any claim under those policies is a self-insured or deductible obligation, as National Union admitted in Exhibit "E" hereto, within the meaning of Paragraph D.6(f) of the Plan Confirmation Order. Thus, there is nothing to arbitrate, because National Union has no obligation to pay any WGI claim for less than the $5 million SIR. Similarly, to the extent that National Union is

ATLLIB01 1626180.1

required to defend the WGI Claims under the Umbrella Policies, there is nothing to arbitrate, as National Union previously has conceded that issues under those policies are not arbitrable. *See* note 1, *supra*.

Because litigation of the controlling, non-arbitrable coverage issues will in effect eliminate any payment dispute requiring arbitration, this Court should enjoin National Union from pursing arbitration, pending the outcome of this litigation. If, as Raytheon contends, the Court rules that Paragraph D.6(f) applies and hence that National Union had no obligation to pay any of the WGI Claims at issue in this case, then the allegedly arbitrable payment dispute would be moot. This outcome-determinative coverage issues and other questions raised by Raytheon's complaint should be resolved in this forum, under Massachusetts law, and not by a New York arbitration panel.

### C. The Payment Agreement Arbitration Clause Does Not Apply to Coverage Disputes Under Policies that Pre-Date the Effective Date of the Payment Agreement.

An arbitrator has no jurisdiction over disputes that occur before the effective date of the agreement that contains the arbitration clause. *Dorado Beach Hotel Corp. v. Union de Trabajadores*, 811 F. Supp. 41 (D. P.R. 1993). An arbitration clause must specifically address retroactivity for the clause to apply retroactively. *Peerless Importers, Inc. v. Wine, Liquor & Distillery Workers Union Local 1*, 903 F.2d 924, 928 (2d Cir. 1990) ("the arbitration clause of a new agreement may not be used to reach back to cover disputes arising before the agreement was executed, unless such preexisting disputes are brought within the scope of the clause"). Even broad arbitration language does not make an arbitration clause retroactive. *See Hendrick v. Brown & Root, Inc.*, 50 F. Supp. 2d 527 (E.D. Va. 1999).

Many of the WGI claims at issue are based upon occurrences during policy periods before the effective date of the Payment Agreement. *See* Lupa Aff. Because the Payment

-15-

Agreement does not apply retroactively, Raytheon is entitled to the declaration sought in Count III of its Complaint that the Payment Agreement does not apply to any claim arising before the effective date of the Payment Agreement, June 1, 1998. Similarly, Count IV of Raytheon's Complaint also is based on occurrences that pre-date the Payment Agreement. In this Count, on which Raytheon has demanded trial by jury, Raytheon seeks reimbursement for money National Union wrongfully demanded as reimbursement for payments that National Union could not collect from WGI because of WGI's bankruptcy filing. The amount in controversy includes $400,000 paid to resolve separate lawsuits filed by Mykel Brister and Linda Hammond, both of which were based upon occurrences in 1997. (Lupa Aff., ¶¶ 15 – 17).[12] Such claims are outside the scope of the Payment Agreement and its arbitration clause.

### D. Requiring Raytheon to Arbitrate Would Deny Raytheon "Meaningful Relief" for National Union's Violations of Massachusetts Law.

Under Massachusetts law, when an insurer unilaterally settles a third-party claim over the objection of its insured, the payment is deemed voluntary; and the insurer cannot seek reimbursement from the insured. *See Medical Malpractice Joint Underwriting Ass'n of Massachusetts v. Goldberg*, 680 N.E.2d 1121, 1129 (Mass. 1997). The *Goldberg* court held that "[w]here an insurer defends under a reservation of rights to later disclaim coverage . . . it may later seek reimbursement for an amount paid to settle the underlying tort action only if the insured has agreed that the insurer may commit the insured's own funds to a reasonable settlement with the right later to seek reimbursement from the insured, or if the insurer secures specific authority to reach a particular settlement which the insured agrees to pay." *Id.* National Union acted wrongfully, in violation of Massachusetts law, by ignoring Raytheon objections to

---

[12] While Raytheon does not have access to the settlement documents, according to the schedule attached to the billing National Union forwarded to WGI, (*see* Lupa Aff. Ex. 8), WGI apparently had paid the $450,000 cash portion of the *Brister* settlement before its bankruptcy, also agreeing to purchase a $300,000 annuity policy to satisfy the balance of the settlement. The annuity was provided by a "sister" company of National Union; but after its bankruptcy, WGI refused to pay the cost of the annuity.

-16-

settlement of the *Valero* claim, *see* Exhibit "F" hereto, and then drawing down Raytheon's letter of credit to satisfy obligations National Union voluntarily assumed in *Valero* on behalf of an insured company fully protected from liability by bankruptcy court proceedings and orders.

An insurer's failure to inform its insured of facts material to the insured's exposure, including information relating to coverage and settlement negotiations, is actionable under Mass. Gen. L. c. 93A. *Peckham v. Continental Casualty Ins. Co.*, 895 F.2d 830 (1st Cir. 1990). "An absence of good faith and the presence of extortionate tactics generally characterize the basis for c. 93A-176D action based on unfair settlement practice." *Guity v. Commerce Ins. Co.*, 631 N.E.2d 75, 77-78 (Mass. App. 1994). National Union's voluntary, unilateral settlement of third party claims without Raytheon's consent; its failure to inform Raytheon of facts material to its alleged exposure; and its extortionate tactics in threatening to draw and then wrongfully drawing upon Raytheon's letter of credit, as detailed in the Lupa affidavit, constitute unfair insurance practices and justify an award of multiplied damages under c. 93A.

The deference afforded arbitration "rests on the assumption that the arbitration clause permits relief equivalent to court remedies." *Paladino v. Avnet Computer Technologies, Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998) (citing *Gilmer v. Interstate/ Johnson Lane Corp.*, 500 U.S. 20, 28 (1991)). Otherwise, arbitration should not be allowed. In *Paladino*, the arbitration agreement at issue limited the remedy to an award of damages for breach of an employment contract and did not encompass the plaintiff's statutory claims for employment discrimination. The court ruled that the arbitration clause deprived the plaintiff of any "meaningful relief" and hence was unenforceable. *Id.* at 1060. *See also Graham Oil Co. v. Arco Products Co.*, 43 F.3d 1244 (9th Cir. 1994) (arbitration clause purporting to forfeit certain statutorily-mandated rights or benefits is unenforceable).

-17-

ATLLIB01 1626180.1

The *Paladino* and *Graham Oil* cases are consistent with previous Supreme Court authority[13] and with the recent Supreme Court ruling in *PacifiCare Health Systems, Inc. v. Book*, 123 S. Ct. 1531 (2003). In *PacifiCare*, the plaintiff sought to avoid arbitration based on the argument that his claims under the Racketeer-Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, were precluded by an arbitration clause barring any award of punitive damages. *See* 123 S. Ct. at 1535. The Court reviewed the pertinent case law to determine whether or not the treble damages provisions of RICO were considered "punitive" in nature and hence barred by the arbitration clause. Noting that the question of whether RICO treble damages were "punitive" remained in doubt, the Court concluded that the arbitrators had authority to decide that question. 123 S. Ct. at 1535.

The uncertainty regarding the sufficiency of the arbitration remedy in *PacificCare*, *i.e.*, are treble damages under RICO punitive and hence beyond the power of the arbitrators to award, is not present here, because the arbitration clause at issue expressly and unequivocally bars the arbitration panel from awarding punitive or "multiplied" damages of any kind, thereby barring any award of double or treble damages under c. 93A.[14] *See* note 2 *supra*. *PacifiCare* otherwise endorsed the view, suggested by *Mitsubishi*, *see* note 10, *supra* and expressly adopted in *Paladino* and *Graham Oil*, that an arbitration clause that deprives a plaintiff of a meaningful

---

[13] In *Mitsubishi Motors Corp. v. Soler Chrysle- Plymouth, Inc.*, 473 U.S. 614 (1985), the Supreme Court ruled that, "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Id.* at 636. However, the Court also noted that if the choice of forum and choice of law clauses in the arbitration agreement "operated in tandem as a prospective waiver of a party's right to pursue statutory remedies . . ., we would have little hesitation in condemning the agreement as against public policy." *Id.* at 637 n. 19.

[14] It is well settled in Massachusetts that the multiple damages available under c. 93A are punitive and not merely compensatory. *See, e.g., International Fidelity Ins. Co. v. Wilson*, 443 N.E.2d 1308, 1317 (Mass. 1983) ("the multiple damage provisions of ch. 93A are designed to impose a penalty"); *Heller v. Silverbranch Construction Corp.*, 382 N.E.2d 1065, 1071 (Mass. 1978) (referring to multiple damages under ch. 93A as "punishment").

-18-

remedy is at odds with public policy and cannot be enforced.[15] The arbitration clause at issue in this case not only fails to permit the relief allowable under c. 93A, it is incorporated in an agreement that chooses New York law, thereby confirming that questions of coverage under insurance policies governed by Massachusetts law; questions of applicability of the *Goldberg* line of cases; and questions regarding remedies under the statutory provisions prohibiting the unfair and deceptive insurance practices at issue are not matters for the arbitration panel to decide. Accordingly, under the *Mitsubishi-Paladino-PacifiCare* line of cases, National Union should not be allowed to arbitrate any of the claims asserted by Raytheon in this case.

## CONCLUSION

Because National Union demands arbitration of insurance coverage disputes under policies that do not contain any arbitration clause; disputes that are outside the scope of the arbitration clause National Union invokes; disputes that relate to insurance coverage for companies no longer subject to the agreement containing the arbitration clause; and disputes regarding claims that accrued long before the effective date of the arbitration agreement National Union invokes, National Union's Demand for Arbitration is both premature and improper. Similarly, because the arbitration clause invoked by National Union expressly prohibits any award of punitive damages or multiple damages, allowing arbitration would deprive Raytheon of "meaningful relief" for National Union's violations of the laws of Massachusetts prohibiting unfair insurance claims settlement practices. An injunction prohibiting arbitration pending the disposition of this case will not prejudice National Union, will avoid irreparable harm to

---

[15] The First Circuit previously has ruled that whether public policy prohibits arbitration when statutory remedies are not available is an issue that may be raised in challenging an arbitration award after the fact. *See, e.g., Thompson v. Irwin Home Equity Corp.*, 300 F.3d 88, 91-92 (1st Cir. 2002); *MCI Telecommunications Corp. v. Matrix Communications Corp.*, 135 F.3d 27, 33 n.12 (1st Cir. 1998). Raytheon respectfully submits that these cases are no longer good law in light of the *PacifiCare* ruling.

Raytheon in being forced to arbitrate issues that it did not agree to arbitrate, and will promote Massachusetts public policy by preventing insurance companies who issue policies in this state from circumventing their obligations under Massachusetts law.

Respectfully submitted,

RAYTHEON COMPANY

By: *William T. Hogan III* [signature]

William T. Hogan, III (BBO No. 237710)
Elizabeth D. Killeen (BBO No. 645178)
Hogan, Roache & Malone
66 Long Wharf
Boston, MA 02110
(617) 367-0330

Of Counsel:

Edmund M. Kneisel, Esq. (Ga. Bar No. 425350)
Brent W. Brougher, Esq. (Ga. Bar No. 086373)
Kilpatrick Stockton LLP
1100 Peachtree Street
Suite 2800
Atlanta, GA 30309

Attorneys for Plaintiff Raytheon Company

Dated: December 8, 2003